UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

SHAUNTAY W. o/b/o T.M.,

            Plaintiff,

-v-

COMMISSIONER OF SOCIAL SECURITY,

            Defendant.

6:22-CV-06059-MJR
DECISION AND ORDER

---

Pursuant to 28 U.S.C. §636(c), the parties consented to have a United States Magistrate Judge conduct all proceedings in this case. (Dkt. No. 12)

Plaintiff Shauntay W.[1] ("Plaintiff") brings this action pursuant to 42 U.S.C. §§405(g) and 1383(c)(3) on behalf of her child, T.M., seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "defendant") denying T.M. Supplemental Security Income Benefits ("SSI") under the Social Security Act (the "Act"). Both parties have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the following reasons, Plaintiff's motion (Dkt. No. 6) is denied and the Commissioner's motion (Dkt. No. 8) is granted.

## BACKGROUND

On July 6, 2018, Plaintiff filed an SSI application on behalf of her minor child, T.M., alleging that T.M. has been disabled since June 21, 2017.[2] (Tr. 15, 166-67). The application was denied on December 19, 2018. (Tr. 15, 81-92). The Plaintiff requested

---

[1] In accordance with the District's November 18, 2020, Standing Order, plaintiff is identified by first name and last initial
[2] References to "Tr." are to the administrative record in this case.

a hearing on December 27, 2018. (Tr. 15, 96-113). On May 12, 2020, an administrative hearing was held via telephone before Administrative Law Judge ("ALJ") Matthew Kuperstein, at which Plaintiff participated, with counsel. (Tr. 26-66). On October 9, 2020, the ALJ issued his decision denying T.M.'s SSI claim. (Tr. 12-28). Plaintiff requested review by the Appeals Council ("AC") (Tr. 7-11), but on January 4, 2022, the AC denied Plaintiff's request, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-6). This action followed.

## DISCUSSION

I.   *Scope of Judicial Review*

The Court's review of the Commissioner's decision is deferential. Under the Act, the Commissioner's factual determinations "shall be conclusive" so long as they are "supported by substantial evidence," 42 U.S.C. §405(g), that is, supported by "such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion," *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted). "The substantial evidence test applies not only to findings on basic evidentiary facts, but also to inferences and conclusions drawn from the facts." *Smith v. Colvin*, 17 F. Supp. 3d 260, 264 (W.D.N.Y. 2014). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force," the Court may "not substitute [its] judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002). Thus, the Court's task is to ask "'whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the

conclusions reached' by the Commissioner." *Silvers v. Colvin*, 67 F. Supp. 3d 570, 574 (WDNY 2014) (quoting *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)).

Two related rules follow from the Act's standard of review. The first is that "[i]t is the function of the [Commissioner], not [the Court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983). The second rule is that "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve." *Veino*, 312 F.3d at 588. While the applicable standard of review is deferential, this does not mean that the Commissioner's decision is presumptively correct. The Commissioner's decision is, as described above, subject to remand or reversal if the factual conclusions on which it is based are not supported by substantial evidence. Further, the Commissioner's factual conclusions must be applied to the correct legal standard. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). Failure to apply the correct legal standard is reversible error. *Id.*

II.   *Standards for Determining "Disability" Under the Act*

An individual under the age of eighteen is considered disabled within the meaning of the Act "if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §1382c(a)(3)(C)(i). The Commissioner has set forth a three-step process to determine whether a child is disabled as defined under the Act. *See* 20 C.F.R. §416.924. At step one, the ALJ determines whether the child is engaged in substantial gainful work activity. *Id.* §416.924(b). If so, the child is not disabled. *Id.* If not, the ALJ proceeds to step two and determines whether the child has a medically

determinable impairment(s) that is "severe." *Id.* §416.924(c). If the child does not have a severe impairment(s), he or she is not disabled. *Id.* If the child does have a severe impairment(s), the ALJ continues to step three. At step three, the ALJ examines whether the child's impairment(s) meets, medically equals, or functionally equals the listed impairments in Appendix 1 to Subpart P of Part 404 of the Commissioner's regulations (the "Listings"). *Id.* §416.924(d). In determining whether an impairment(s) functionally equals the Listings, the ALJ must assess the child's functioning in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. *Id.* §416.926a(b)(1)(i)-(vi). To functionally equal the Listings, the child's impairment(s) must result in "marked" limitations in two domains or an "extreme" limitation in one domain. *Id.* §416.926a(a). A child has a "marked" limitation when his or her impairment(s) "interferes seriously" with his or her ability to independently initiate, sustain, or complete activities. *Id.* §416.926a(e)(2). A child has an "extreme" limitation when his or her impairment(s) "interferes very seriously" with his or her ability to independently initiate, sustain, or complete activities. *Id.* §416.926a(e)(3). If the child has an impairment(s) that meets, medically equals, or functionally equals the Listings, and the impairment(s) meets the Act's duration requirement, the ALJ will find the child disabled. *Id.* §416.924(d).

III.   *The ALJ's Decision*

At step one of the sequential evaluation process, the ALJ found that T.M., who was between 12 and 14 years old during the relevant period, had not engaged in substantial gainful activity. (Tr. 16). At step two, the ALJ found that T.M. had the following severe

impairments: attention deficit hyperactivity disorder (ADHD), receptive and expressive language delay, asthma, and constipation. (Tr. 16). Next, the ALJ found that T.M. did not have an impairment which met or equaled the Listings. (Tr. 16). Lastly, the ALJ found that T.M. did not have an impairment which functionally equaled the Listings, because he did not have two marked limitations or one extreme limitation in the six domains of functioning. (Tr. 17). Instead, the ALJ found that T.M. had less than marked limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and health and physical wellbeing; and no limitation in the domains of moving about or manipulating objects and caring for himself. (Tr. 18). The ALJ, therefore, concluded that T.M. was not disabled. (Tr. 24).

IV. *Plaintiff's Challenge*

Plaintiff challenges the ALJ's functional equivalence finding, specifically the finding that T.M. had less than marked limitations in the domains of acquiring and using information and attending and completing tasks. Plaintiff argues that, in finding that T.M. had less than marked limitations in the foregoing two domains, the ALJ overlooked evidence that he had difficulties with learning and with distractibility, that he had expressive and receptive language delays, and that he had poor grades. Plaintiff then asserts that, when the ALJ evaluated the domain of acquiring and using information, he ignored the statement of Speech and Language Pathologist ("SPL") Marydel Wypych that T.M.'s language delays "may adversely affect his academic performance, life experiences, ability to be understood by others, and communication at an age-appropriate level." (Tr. 351). Plaintiff claims that when the ALJ evaluated the domain of attending and completing tasks, he ignored evidence showing that that T.M. required special

5

accommodations to address his inattentiveness. Plaintiff also contends that, when evaluating both domains, the ALJ did not compare T.M.'s abilities to those of same-age peers. Plaintiff then claims that the ALJ mischaracterized and selectively read the record but does not specify which evidence the ALJ read incorrectly. The Court finds Plaintiff's challenges to the ALJ's functional equivalence finding to be without merit.

The ALJ thoroughly evaluated the evidence and concluded that T.M. had a less than marked limitation in the domain of acquiring and using information. (Tr. 21). As an initial matter, in evaluating this domain, the ALJ must consider how well the child acquires and learns information and how well he uses the information he has learned. 20 C.F.R. § 416.926a(g). Because during the relevant period T.M. was 12 to 14 years old, he was considered an adolescent. 20 C.F.R. § 416.926a(g)(v) (defining an adolescent as a child between age 12 to attainment of age 18). (Tr. 59). The Commissioner's regulations provide insight into what children at various ages should be able to do. 20 C.F.R. § 416.926a(g)(iii)(v).

Adolescents, like T.M., should be able to demonstrate what they have learned in academic assignments; and should also be able to use what they have learned in daily living situations without assistance, like going to the store, using the library, and using public transportation. 20 C.F.R. § 416.926a(g)(v). Examples of limitations in this domain (although not necessarily marked or extreme limitations) include talking in short and simple sentences, having difficulty explaining what they mean, having difficulty recalling important things, and having difficulty solving mathematic questions. 20 C.F.R. § 416.926a(g)(v)(ii).

6

Contrary to plaintiff's argument, in finding that T.M. had a less than marked limitation in this domain, the ALJ acknowledged that T.M.'s school records showed that he had poor grades. (Tr. 21; *see* Tr. 415). Contrary to plaintiff's argument that the ALJ ignored his special services, the ALJ acknowledged that T.M. was in special education classes (Tr. 23; *see* Tr. 348), where he was provided with special accommodations, such as testing accommodations. (Tr. 19; *see* Tr. 268), and where he was provided with speech and language services (Tr. 21; *see* Tr. 264-78, 348, 414-28). Based on the foregoing evidence, the ALJ concluded that Plaintiff had established that T.M. had a limitation in the domain of acquiring and using information. (Tr. 21).

However, based upon the evidence as a whole, the ALJ determined that the limitation in this domain was less than marked. (Tr. 21). The ALJ noted that while T.M.'s grades were generally poor, he did not have to repeat any grade, but was advancing grades at the same level as his peers. (Tr. 21; *see* Tr. 62, 374). The ALJ noted that Plaintiff testified that T.M. did well in gym and Social Studies. (Tr. 54, 55). The fact that T.M. was able to do well in some subjects indicates that he had the ability to learn in some areas, perhaps because those subjects interested him. It stands to reason that if T.M. had marked or extreme limitations in his ability to learn, those limitations would likely manifest in all subjects, not just some of them.

Likewise, the ALJ noted that once T.M. started taking medication, hiss grades were beginning to improve. (Tr. 20-21; *see* Tr. 348, 374). Despite the fact that T.M.'s grades were beginning to improve on medication, he was not taking any medications at the time of the hearing or for the year prior. (Tr. 21; *see* Tr. 49, 360, 363). It was appropriate for the ALJ to consider the claimant's failure to take medications when determining his non-

disability. *Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983) (noting that Dumas was unwilling to help himself by following treatment recommendations and remarking, "[o]f course, a remediable impairment is not disabling"); *Lesanti v. Comm'r of Soc. Sec.*, 436 F. Supp. 3d 639, 651 (W.D.N.Y. 2020) (finding that the ALJ appropriately considered claimant's non-compliance with treatment was inconsistent with her allegations of disability). In this case, the evidence shows that T.M.'s grades might not have been as low as they were if he had continued to take his medication.

The ALJ also considered the questionnaires completed by T.M.'s eighth-grade special education teacher, Aaron Boucher. (Tr. 21, 23; *see* Tr. 220-25). On May 8, 2020, Mr. Boucher completed a questionnaire, wherein he assessed T.M.'s ability to function in the various domains, by checking off whether T.M. had either no problem, a slight problem, an obvious problem, a serious problem, or a very serious problem in different subcategories that pertained to each domain. (Tr. 220-25). In the domain of acquiring and using information, Mr. Boucher indicated that T.M. did not have a very serious problem in any of the 10 subcategories. (Tr. 21). Mr. Boucher assessed that T.M. had a serious problem in a single subcategory (comprehending and doing math problems); and that he had an obvious problem in two categories (in comprehending written materials and in expressing ideas in written form). (Tr. 221). Mr. Boucher checked off that T.M. had a slight problem in the remaining *seven* subcategories, including in comprehending oral instructions, understanding school and content vocabulary, understanding and participating in class discussions, learning new material, recalling and applying previously learned material, and applying problem-solving skills in class discussions. (Tr. 221). This point contradicts Plaintiff's contention that T.M. had a marked limitation in acquiring and

8

using information – out of the 10 subcategories that pertain to this domain, Mr. Boucher assessed that T.M. had only slight problems in seven subcategories and no very serious problems. (Tr. 221). Notably, the ALJ explained that he found Mr. Boucher's opinion somewhat persuasive because he had taught T.M. for an eight-month period, and worked with him every day in multiple subjects. (Tr. 23; *see* Tr. 221).

The ALJ also noted that the record contains an incomplete teacher's questionnaire, that is undated, does not identify the teacher's name, and does not include an assessment of all domains. (Tr. 23; *see* Tr. 233-26). That teacher's questionnaire was significantly more restrictive than Mr. Boucher's questionnaire, as it indicated that, in acquiring and using information, T.M. had a very serious problem in three subcategories, a serious problem in five subcategories, and an obvious problem in no category. (Tr. 235). The ALJ explained that this questionnaire was not persuasive because it was undated, unsigned, and did not address most of the domains. (Tr. 23). Moreover, the ALJ found that the questionnaire was inconsistent with other evidence, discussed above, showing that T.M. had shown some progress in his academics. (Tr. 23). It bears noting that in the narrative section of the questionnaire the teacher did not attribute T.M.'s difficulties in this domain to a difficulty with learning but rather to his temperament. (Tr. 235). The teacher explained that T.M was a "very social student" who avoided academic tasks and refused to complete tests or assessment. (Tr. 235). The teacher also stated that T.M. refused speech services. (Tr. 235). Thus, it appears that there was a willful component to T.M.'s difficulties in this domain. Plaintiff does not argue that this questionnaire should have been found more persuasive.

In evaluating the limitations in this domain, the ALJ also acknowledged that a December 2018 speech and language evaluation, administered by SLP Wypych, revealed that T.M. had severe receptive and expressive language delays. (Tr. 21; see Tr. 351). The ALJ noted, however, that during the testing, SLP Wypych remarked that T.M.'s presentation was "poor," that he did not appear to attempt to do his best, and the results of the examination were possibly lower than his capability. (Tr. 21; see Tr. 349-50). The ALJ also noted that treatment records did not show significant problems in this area. (Tr. 21). On the contrary, treatment records indicated that T.M. had fluent speech and intact comprehension. (Tr. 386, 390, 393, 399; see Tr. 21). Moreover, as the ALJ noted, Mr. Boucher indicated that T.M. did not have significant deficits with speech. (Tr. 21; see Tr. 224). Mr. Boucher indicated that T.M.'s speech could be understood almost all of the time. (Tr. 224). Nonetheless, the ALJ explained that even though SLP Wypych did not specifically assess T.M.'s abilities in the domains of functioning, her report was persuasive in showing that the child had some deficits in speech, which required addressing by the school's individualized education plan ("IEP"). (Tr. 24).

Plaintiff takes issue with the ALJ's evaluation of SLP Wypych's report, claiming that the ALJ ignored SLP's Wypych's "opinion" that T.M.'s language delays "may adversely affect his academic performance, life experiences, ability to be understood by others, and communication at an age appropriate level." (Tr. 351).

As an initial matter, SLP Wypych's statement does not appear to be a medical opinion under the applicable Social Security regulations. Under the regulations, a medical opinion is a statement from a medical source about what the claimant can still do despite his impairment(s), and whether he has one or more impairment-related limitations in

various abilities, in this case, in acquiring and using information. 20 C.F.R. § 416.913(a)(2)(i). SLP Wypych's opinion does not provide that information.

Moreover, SLP Wypych's statement that T.M.'s language delays "may adversely affect" his academic performance does not mean that he had a marked limitation in acquiring and using information. (Tr. 18, 21). She did not offer any opinion as to whether his deficits were marked, moderate, mild or something in between. In fact, SLP Wypych indicated that, with appropriate intervention, T.M.'s prognosis for improvement was good, which suggests that his deficits could be reasonably remedied (Tr. 351).

Finally, the fact that the ALJ did not discuss this portion of SLP Wypych's report does not mean that he did not consider it, particularly where the ALJ cited to other portions of the report. An ALJ is not required to cite to every shred of evidence in the record. *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." (internal quotation marks and citations omitted)); *see also Cichocki v. Astrue*, 729 F.3d 172, 176-77 (where the evidence of record permits the court to glean the rationale of an ALJ's decision, an ALJ need not recite every piece of evidence that contributed to the decision).

In addition to the school records and medical records discussed above, the ALJ also considered the medical opinions in the record. (Tr. 21, 23-24). The ALJ noted that consultative psychologist Dr. Christine Ransom, Ph.D., examined T.M. at the Commissioner's request on October 29, 2018, and assessed that he had no limitation in following and understanding age-appropriate directions, learning in accordance with cognitive functioning, asking questions, and requesting assistance in an age-appropriate manner. (Tr. 23; *see* Tr. 282). Dr. Ransom based her opinion on her examination findings,

which revealed that T.M.'s expressive and receptive language skills were adequate, his thought processes were coherent, his attention and concentration were intact, his memory was intact, his cognitive functioning appeared to be average, and his insight and judgment were average. (Tr. 282). Although the ALJ departed somewhat from Dr. Ransom's opinion and found that T.M. had a less-than-marked limitation in this domain (rather than no limitation), Dr. Ransom's opinion is still insightful because it is in line with the ALJ's ultimate conclusion that T.M. did not have a marked limitation in this domain.

The ALJ also considered the findings of the State agency consultants who reviewed the evidence in the record on December 17, 2018. (Tr. 21, 23; *see* Tr. 72-74). Dr. A. Chapman, a psychologist, and Dr. J. Randall, a pediatrician, assessed that T.M. had a less than marked limitation in acquiring and using information. (Tr. 72). Among the evidence Dr. Chapman and Dr. Randall highlighted were the evaluations of SLP Wypych and Dr. Ransom, discussed above. (Tr. 72; *see* Tr. 280-83, 348-52). The ALJ found that the assessments of the State agency consultants were persuasive because they were supported by, and consistent with the evidence in the record. (Tr. 23).

The ALJ's finding that T.M. had a less than marked limitation in this domain is also supported by his activities of daily living. (Tr. 21). The ALJ noted that T.M. had played basketball, (Tr. 19-20; *see* Tr. 286), football (Tr. 282, 287), and video games. (Tr. 20; *see* Tr, 282, 287). T.M.'s abilities to play basketball, football, and video games, indicate that he was able to acquire and use information that related to recreational activities that interested him. (Tr. 282; *see also* Tr. 286-87). In short, the foregoing evidence supports a finding that, although T.M. had a limitation in this domain, the limitation was less than marked.

Finally, there is no merit to plaintiff's claim that the ALJ failed to compare T.M.'s functioning to same age peers. The ALJ made clear that he was considering T.M.'s functioning "compared to the performance of other children of the same age who do not have impairments." (Tr. 18, citing 20 C.F.R. § 416.926a). The decision demonstrates that the ALJ applied this standard. For example, the ALJ noted that, although T.M.'s grades were generally poor, he was advancing grade levels, like his peers. (Tr. 21). Similarly, the ALJ relied on the teacher assessment from Mr. Boucher, (Tr. 23) which, in turn, was based upon a comparison of T.M.'s functioning to those same-aged children without impairments. (Tr. 220). Likewise, the ALJ relied on Dr. Ransom's opinion, which in turn, indicated that T.M. had no limitation in following and understanding *age-appropriate* directions and in asking questions and requesting assistance in an *age-appropriate* manner. (Tr. 23; *see* Tr. 282). The ALJ also relied on the assessments of Dr. Randall, who considered how the child's functioning compares to those of same-aged children who did not have impairments. (Tr. 76). Because the ALJ considered the foregoing evidence, plaintiff's argument that the ALJ's decision failed to compare T.M.'s functioning to those of same-aged peers is not borne out by the evidence.

In the domain of attending and completing tasks, the ALJ must consider how well the child is able to focus and maintain attention, how well he begins, carries through and finishes activities, the pace at which the child will perform the activities, and the ease with which he changes them. 20 C.F.R. § 416.926a(h). Adolescents, like T.M., should be able to pay attention for increasingly longer presentations and discussions, maintain concentration while reading textbooks, and organize their materials. 20 C.F.R. § 416.926a(h)(v). Examples of limited functioning in this domain (although not necessarily

marked or extreme limitations) include failing to complete activities of interest to him, such as games or art projects, repeatedly becoming side-tracked from his activities or interrupting others, becoming easily frustrated and giving up on tasks, and requiring extra supervision to keep him engaged. 20 C.F.R. § 416.926a(h)(2).

There is substantial evidence showing that T.M. had a less than marked limitation in attending and completing tasks. (Tr. 21). In making his finding, the ALJ again considered the medical evidence. (Tr. 21). The ALJ noted that Dr. Chapman and Dr. Randall, the State agency consultants, found that T.M. had a less than marked limitation in attending and completing tasks. (Tr. 21; *see* Tr. 73). The ALJ noted that Dr. Ransom, the consultative psychologist, assessed that T.M. had no limitation in sustaining concentration to complete age-appropriate tasks. (Tr. 21; *see* Tr. 282). Dr. Ransom's opinion was supported by her findings that T.M. had intact attention and concentration, as demonstrated by his ability to count backwards from 20, do simple calculations, and do serial-seven calculations without error. (Tr. 21; *see* Tr. 281).

Like Dr. Ransom, Dr. Rita Figueroa, another consultative examiner, who performed a pediatric examination of T.M on November 2, 2018, also found that he appeared to have normal attention span for his age. (Tr. 287). She opined that T.M. should be able to participate in social, educational, and recreational activities. (Tr. 289). Similarly, SPL Wypych also remarked that that T.M. was attentive during the speech evaluation that she administered to him, although at times it appeared that he was not trying his best. (Tr. 349-50). Thus, the findings and opinions of the consultative examiners and State agency consultants all indicate that T.M. did not have a marked limitation in this

domain. Plaintiff has not introduced any opinion showing that T.M. had a marked limitation in this domain.

T.M.'s medical records also do not support a finding of a marked limitation in attending and completing tasks. Treatment records reveal that T.M. was diagnosed with ADHD in September 2018, by Dr. Matthew Stevens, and was started on medication, initially Concerta (Tr. 360). T.M.'s medication was switched to Adderall in January 2019. (Tr. 360, 374, 388). During a May 16, 2019 visit, while T.M. was still taking his Adderall medication daily, Plaintiff reported that T.M. was less hyperactive. (Tr. 388). She added, however, that he was still having issues with his behavior, and that a recent report card indicated that he was failing almost every class. (Tr. 388). According to Dr. Stevens's progress notes, T.M. self-discontinued his medication in May 2019, and was not interested in re-starting. (Tr. 360).

It appears that the medication was re-started at some point, but on September 27, 2019, Plaintiff reported that T.M. was refusing to take the afternoon dosage, and he did not want to be prescribed any more medication. (Tr. 374). One month later, on October 22, 2019, T.M. was more willing to take medication, and Dr. Steven re-started him on Adderall. (Tr. 374). According to a December 11, 2019, progress note, Plaintiff stated that T.M.'s grades, which were mostly C's and Ds had "improved from where they were when school year began, and he wasn't taking medications." (Tr. 374). The progress note further states that, "[t]eachers stated that he 'picks and chooses when he wants to engage and do homework.'" (Tr. 374). This progress note not only indicates that T.M. was doing better when he was on medication, but also that there was a willful component to his participation and, related success, in school.

On April 1, 2020, T.M. returned to Dr. Stevens for a follow up of his ADHD, at which time T.M. indicated that he was again not interested in taking medications. (Tr. 360). Dr. Stevens's examination revealed "[n]o concerning findings." (Tr. 360). Plaintiff reported that she had discontinued T.M.'s Adderall because he was refusing to take it. (Tr. 363). T.M. explained that the medication made him feel "different" and he did not talk to people as much as before. (Tr. 363). Plaintiff reported that since doing online learning at home, T.M. has been doing "okay," although he still needed some reminders to complete tasks. (Tr. 363). In short, treatment records reveal that T.M. experienced an improvement in his symptoms of ADHD when he was on medication, but he refused to take it, and his mother did not require that he do so. Again, T.M.'s non-compliance with treatment undermines his allegation of disability. *Dumas,* 712 F.2d at 1553; *Lesanti,* 436 F. Supp. 3d at 651.

The assessment of Mr. Boucher also indicates that T.M. had a less than marked limitation in attending and completing tasks. (Tr. 222). Out of the 13 subcategories listed in this domain, Mr. Boucher indicated that T.M. had only a slight problem in five subcategories, an obvious problem in six subcategories, and a serious problem in two subcategories. (Tr. 222). Mr. Boucher did not find a very serious problem in any of the 13 subcategories (Tr. 222).

T.M.'s activities of daily living also support a finding that he had had a less than marked limitation in attending and completing tasks. Activities such as playing football, basketball, and video games, demonstrate that T.M. was able to focus on tasks that interested him (Tr. 282, 287).

In short, the ALJ's finding of a less than marked limitation in this domain, and in the former domain of acquiring and using information, is supported by the assessments

of Drs. Chapman, Randall, and Ransom; by the observations of Dr. Figueroa and SLP Wypych; by T.M.'s treatment records confirming that he experienced an improvement in his symptoms with medication, but refused to take it; by the teacher assessment of Mr. Boucher; and by T.M.'s activities of daily living.

Under the deferential standard of review, the Commissioner's findings of fact must be upheld unless "a reasonable factfinder would *have to conclude otherwise.*" *Brault*, 683 F.3d at 448. The question is not whether there is substantial evidence to support the claimant's position, but whether there is substantial evidence to support the ALJ's decision. *Bonet ex rel. T.B. v. Colvin*, 523 F. App'x 58, 59 (2d Cir. 2013). In this context, the Commissioner's decision that T.M. was not disabled must be affirmed.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for judgment on the pleadings (Dkt. No. 6) is denied and the Commissioner's motion for judgment on the pleadings (Dkt. No. 8) is granted.

The Clerk of the Court shall take all necessary steps to close the case.

**SO ORDERED.**

Dated:   May 21, 2025
         Buffalo, New York

                                                    MICHAEL J. ROEMER
                                                    United States Magistrate Judge